GARDEN CITY FEEDER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24423. Promulgated March 30, 1937.

*Arnold F. Schaetzle, Esq.*, and *H. M. Havner, Esq.*, for the petitioner.

*Harold Allen, Esq.*, and *Brooks Fullerton, Esq.*, for the respondent.

772

OPINION.

HILL: This proceeding was first heard at St. Paul, Minnesota, in June 1929, and the adjourned hearing was concluded at the same place on October 16, 1931. Thereafter, on motion of the respondent, the St. Paul record was suppressed and a new hearing or trial *de novo* was had at Washington, commenced on June 27 and concluded on July 1, 1932. The Board's report, based solely on the record of the Washington hearing, is published at 27 B. T. A. 1132. The case was taken on review to the United States Circuit Court of Appeals for the Eighth Circuit, which reversed the Board's decision and remanded the cause for further proceedings, 75 Fed. (2d) 804.

On September 20, 1935, petitioner filed a motion requesting the Board to redetermine the issues, under the Circuit Court's mandate, solely on the record made at St. Paul. Respondent opposed this motion, and the motion was denied by order of the Board dated August 3, 1936. In its brief, petitioner assigns the Board's action as error, and argues the point at length. Respondent later withdrew opposition to petitioner's motion, and the Board, upon reconsideration of the matter, vacated its prior order of August 3, 1936, and granted petitioner's motion, as well as a similar motion of the respondent. Hence, further discussion of the question thus raised by petitioner has become unnecessary here, since our decision will be based solely on the record of the St. Paul hearing.

Respondent has determined fraud penalties, and in respect thereof has the burden of proof. However, petitioner has conceded that the percentage fraud penalty should attach to the additional tax from any source over and above that reported on its original returns for the taxable years. The record also clearly establishes fraud with intent to evade tax, and we have so found. Accordingly, the amounts of the fraud penalties will be recomputed as provided in section 250 (b) of the Revenue Acts of 1918 and 1921, on the basis of deficiencies finally redetermined hereunder.

Respondent alleged understatements of income for the taxable years arising from the manipulation of a so-called "Kitty Fund."

The parties have since stipulated the amount of understatement of income on that account for each taxable year, which amounts are set forth in our findings of fact above, and will be reflected in the final recomputations of tax liability.

Other issues raised by the parties have been abandoned or otherwise eliminated, leaving for consideration here only three questions, which concern (a) the value of a certain patent at March 1, 1913, for purposes of depreciation or exhaustion; (b) adjustments to inventories; and (c) special assessment of profits taxes for the years 1918, 1919, and 1920.

### Value of Patent at March 1, 1913.

Petitioner contends that a March 1, 1913, value for its United States Patent No. 985,478 should be determined at from $350,000 to $500,000, and annual depreciation deductions thereon allowed in each of the taxable years based upon a remaining life of 15 years from the basic date. Respondent concedes the allowance of depreciation deductions on a patent value not in excess of $25,000.

At the hearing voluminous testimony was adduced by both parties bearing on the question of patent value. Petitioner introduced six expert witnesses who expressed opinions fixing the value of the patent in amounts ranging from $350,000 to $600,000 at the basic date. Respondent offered four witnesses, one of whom testified that in his opinion the maximum value was $25,000, another thought the value was not greater than $15,000, and two expressed the view that the patent was of doubtful or very little value.

Value of property at a given date can seldom, if ever, be determined with mathematical accuracy, in the absence of an established current market embracing a concourse of buyers and sellers. It is a matter of opinion and evidence. *May Rogers*, 31 B. T. A. 994, 1004. We are not bound to adopt the opinion of an expert witness, particularly where it is in conflict with other facts disclosed. Such testimony must be viewed in the light of all the evidence of record. *Old Mission Portland Cement Co.* v. *Commissioner*, 69 Fed. (2d) 676; *Stiles* v. *Commissioner*, 69 Fed. (2d) 951; *Gloyd* v. *Commissioner*, 63 Fed. (2d) 649; certiorari denied, 290 U. S. 633; *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893, 897; *Tracy* v. *Commissioner*, 53 Fed. (2d) 575, 577; certiorari denied, 287 U. S. 632; *Anchor* v. *Commissioner*, 42 Fed. (2d) 99, 100.

The values expressed in the opinions of petitioner's witnesses in the present case are not only out of line with the other evidence, but to a material extent were based upon an erroneous assumption of factors which do not exist here, or were arrived at without knowledge of the true facts involved. Such opinions are entitled to but little,

if any, weight and can not be accepted as compelling evidence of value. Cf. *Keystone Wood Products Co.*, 19 B. T. A. 1116.; affd., 66 Fed. (2d) 258; *H. H. Blumenthal*, 21 B. T. A. 901; *First National Bank of Birmingham, Trustee*, 29 B. T. A. 352.

Petitioner's patent was not a broad basic patent, conferring a monopoly of commercial importance. It covered, at most, only an improvement to the existing art, of very narrow application. Its principal feature consisted of the particular arrangement of a retarder comb and tilting finger, for use in a threshing feeder. Both of these devices were known to the prior art, and later were used without infringement in machines manufactured under other patents. In 1923 petitioner brought an infringement suit against the J. I. Case Manufacturing Co., and notwithstanding that company had theretofore manufactured and sold more than 20,000 feeders under the Crandall and Krause patent, using a combination of retarder comb and tilting tooth, the results of the litigation were that the first decree entered finding no infringement was set aside and petitioner's bill dismissed; petitioner did not recover any damages, but paid the costs and granted a free license to the Case Co. to manufacture under its patent.

These facts, in our opinion, tend to support the views expressed by respondent's witnesses, and to negative the idea that the patent had the high value attributed to it by petitioner's witnesses. Other factors disclosed by the record, such as the value computed on a royalty basis, or a value determined by capitalizing the net earnings in excess of a reasonable allocation to tangibles, which we deem it unnecessary to discuss in detail here, all lead to the same conclusion.

From a careful consideration of all the evidence before us, we have found that petitioner's patent had a fair market value at March 1, 1913, of $25,000. The proof, we think, does not justify a higher valuation for the patent at the basic date.

### Adjustments to Inventories.

Petitioner took inventory in each of the taxable years, during the slack season, usually in September. A physical count was made under the direction of the shop foreman and recorded in shop books. Summary books were prepared from the shop books, and the total inventory computed and recorded in the former. The results were transferred to petitioner's books of account, which agreed with the entries in the summary books, but the summary books did not reflect the true physical count as shown by the shop books. The entries in the summary books as to many items were substantially less than those recorded in the shop books, the reduction in some instances

amounting to 50 percent. Petitioner had no system of cost accounting, and could not accurately determine the cost of many items.

In 1925 a revenue agent investigated petitioners' books, and requested access to its inventory records. He was told that the original records had been destroyed, and that no data were available as to inventories for the taxable years. At the hearing in 1929 respondent discovered that the original inventory records or shop books had not been destroyed, and they were then produced for the first time.

In addition to the omission from the inventories of materials on hand as shown by the physical count recorded in the shop books, petitioner charged to expense and omitted from the valuation of its inventories such items of cost as labor, freight, and manufacturing expenses from the date of taking the inventories to the end of the year.

The record clearly and convincingly establishes, we think, that petitioner fraudulently manipulated its inventories so as to understate income with intent to evade tax. In its brief petitioner concedes that it omitted "portions from the inventory of stock on hand" and agrees that the omitted items "as determined by the respondent should be restored and added to the inventory as submitted in the original returns." As to the omission of items of cost, above referred to, which are essential to a determination of inventory valuation, petitioner's brief is silent. Thus, it appears, there is no controversy between the parties respecting the inclusion of omitted items, nor is the correctness of respondent's allegations on this point assailed. The disagreement pertains to the matter of valuation.

Petitioner's principal contentions are (1) that "for the year 1920, ending December 31, 1920, an adjustment should be allowed for market value of not less than 25% to 40%" on account of an alleged general decline in the market, and (2) "in the case of scrap iron the amount should be determined on a basis of $20 per ton."

The first contention, that the prices at which all items were valued, except scrap iron, should be reduced from 25 to 40 percent on account of a decline in the market, obviously can not be sustained. The decline referred to was from a prior market price, which may or may not have been the cost or invoice price to petitioner of the various items involved. In other words, to reduce the cost or invoice price by the percentages mentioned would not necessarily reflect the decline in the market. Furthermore, the general statement that the market declined 25 to 40 percent is too vague and indefinite to form any reasonable basis for valuation of a specific inventory.

In respect of petitioner's second contention, that the scrap iron listed in the 1920 inventory should be valued at $20 per ton, it appears that respondent has used this figure in his proposed adjustment.

We find no basis of support in the record for petitioner's objections. On the other hand, the evidence supports the adjustments to inventories as set out in our findings of fact for all years involved.

Petitioner complains in general terms respecting the methods of determining the inventory adjustments, alleging inconsistency and approximation of amounts in some instances. Such argument is not impressive. If absolute accuracy in determining the amount of petitioner's inventories is not now attainable, it is the direct result of petitioner's own failure to take its inventories in a proper manner and to maintain proper records. In our opinion, the adjustments reflect petitioner's true income, as affected by inventories, as accurately as may be in the present circumstances. Petitioner is complaining in effect of the results of its own wrongful actions. "The Government should not be made to suffer because the taxpayer did not keep proper records to show its correct tax liability." *Miller Saw-Trimmer Co.*, 32 B. T. A. 931, 939.

## Special Assessment.

Petitioner contends that under the provisions of section 327 (d) of the Revenue Act of 1918 it is entitled to have its profits tax for the years 1918, 1919, and 1920 determined as provided in section 328 of said act.

The statute, in part pertinent here, reads as follows:

SEC. 327. That in the following cases, the tax shall be determined as provided in section 328:

\*     \*     \*     \*     \*     \*     \*

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. \* \* \*

The sole question for consideration at this time is whether the record discloses abnormal conditions affecting the capital or income of petitioner. If so, petitioner has made a prima facie showing, indicating the probability that subdivision (d) is applicable, notwithstanding it can not be determined, in the absence of comparative data whether there is gross disproportion between the tax of this petitioner and comparable taxpayers, or whether petitioner, in the light of such comparison, would be subject to exceptional hardship. These are matters for later determination under the provisions of section 328. *Pierce Oil Corporation*, 32 B. T. A. 403, 416.

Petitioner points to two factors which it asserts constitute abnormalities affecting capital and income, namely, the use of large

amounts of borrowed capital, and a patent alleged to have a value of $350,000 to $600,000, neither of which items enters into the computation of statutory invested capital. Sec. 326, Revenue Act of 1918; art. 1561, Regulations 45; *La Belle Iron Works* v. *United States*, 256 U. S. 377, 389; *Stephens-Adamson Manufacturing Co.*, 16 B. T. A. 41; affd., 51 Fed. (2d) 681.

Since we have found that the patent in question had a value of only $25,000, its importance as a factor indicating special assessment is greatly diminished. And this is particularly true in the light of the uncertainty respecting the extent to which the patent was an income-producing factor. The use of this intangible asset in petitioner's business, under all the circumstances shown, is insufficient, we think, to justify the granting of special assessment.

Does the fact that petitioner borrowed considerable amounts of money during the respective taxable years constitute an abnormal condition affecting its capital or income, entitling it to special assessment? Abnormality is a fact that must be determined in each case, and the burden of proof in this respect is upon the petitioner. *B. Hayman Co.*, 25 B. T. A. 736, 744.

The only evidence adduced by petitioner concerning borrowed capital is the stipulation of the parties showing the average daily borrowings for each of the years 1918, 1919, and 1920, which amounts are set out in our findings of fact hereinabove.

Petitioner offered no evidence to show that the borrowed money was actually used in the operation of its business, or that it contributed to any extent to the production of the taxable income. These are essential elements of proof. *Robert Wise Co.*, 16 B. T. A. 494; *Peck Coal Corporation*, 15 B. T. A. 189. Nor did petitioner show that the use of borrowed money in the amounts stated was usual or unusual, normal or abnormal, in the industry or business in which it was engaged. If we should assume that the money borrowed by petitioner was used in its business and was an income-producing factor, nevertheless, if it was customary for corporations engaged in similar businesses to operate upon borrowed money to an extent comparable to that of this petitioner, the borrowed capital used by petitioner could not be said to constitute an abnormal condition. Mere proof of borrowings does not establish abnormality, and, in the absence of evidence respecting the use generally of borrowed capital in the particular line of business, there is no basis upon which we may predicate an opinion that the use of borrowed money in this case created an abnormality. *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566; *Camden Woolen Co.*, 12 B. T. A. 1277; *Peck Coal Corporation*, supra; *Western Indiana Gravel Co.*, 25 B. T. A. 654, 664.

Petitioner's average daily borrowings approximated 48, 54, and 71 percent of its statutory invested capital for the respective taxable years, and its net income as computed by respondent amounted to 35, 35, and 47 percent of invested capital for the respective years. However, neither the fact that its percentages of profits were high, nor the fact that its borrowed capital constituted a large percentage of invested capital, alone would entitle petitioner to special assessment. *Ferdinand Buedingen Co.*, 13 B. T. A. 1065; *C. A. Dahl Co.*, 10 B. T. A. 915; *Deline Manufacturing Co.*, 6 B. T. A. 711. See also *B. Hayman Co., supra; Moses-Rosenthal Co.*, 17 B. T. A. 622.

Petitioner has wholly failed to bring itself within the purview of section 327 (d), *supra*, and, on authority of the decisions cited, its plea for special assessment of its profits taxes in accordance with the provisions of section 328 is denied.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*