R. M. SMITH, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentSmith, Inc. v. CommissionerDocket No. 478-74.United States Tax CourtT.C. Memo 1977-23; 1977 Tax Ct. Memo LEXIS 422; 36 T.C.M. (CCH) 97; T.C.M. (RIA) 770023; January 31, 1977, Filed *422 Held: Values of patents on various types of lawn and garden equipment and packaging devices determined. Held,further: Petitioner failed to prove that the failure of petitioner's liquidated subsidiary corporation to report depreciation recapture on its final return was not due to negligence or intentional disregard of rules and regulations. Imposition of addition to tax under sec. 6653(a), I.R.C. 1954, upheld. *423 Kenneth P. Simon, for the petitioner. Joseph M. Abele, for the respondent. DRENNENMEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent*424 determined deficiencies in petitioner's corporate income taxes and a liability against petitioner as a transferee of assets of Gilmour Manufacturing Co. for a deficiency in its corporate income tax and an addition to tax as follows: Deficiencies TYECorporate income Aug 31,tax deficienciesTotal1970$68,123.58197196,606.94$164,730.52Transferee LiabilityAddition to tax PeriodDeficiency1 under sec. 6653(a) TotalJuly 1, 1969to Mar. 31, 1970$124,329.85$6,216.51$130,546.36Due to concessions made by both parties at trial and on brief with regard to both the determined transferee liability and income tax deficiencies, the only issues remaining for decision are: (1) Whether deductions claimed by petitioner with respect to depreciation and amortization for its taxable years ending August 31, 1970, and August 31, 1971, were overstated because petitioner's basis in depreciable property determined under section 334(b)(2) was overstated. (2) Whether Gilmour Manufacturing Co., transferor*425 of assets to petitioner, was liable for an addition to tax under section 6653(a) for the period July 1, 1969, to March 31, 1970. 2FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts together with associated exhibits are incorporated herein by this reference. Petitioner is a corporation organized under the laws of the Commonwealth of Pennsylvania. Its principal office and place of business at the time of filing the petition herein was 926 North Center Street, Somerset, Pa. It filed its Federal income tax returns for its fiscal years ended August 31, 1970, and August 31, 1971, with the Office of the Internal Revenue Service at Philadelphia, Pa. Prior to the purchase of the stock of Gilmour Manufacturing Co., described below, petitioner was engaged in the business of real estate development. Petitioner filed its income tax returns under the name Morrison Enterprises, Inc., until June 26, 1970, when its name was changed to R.M. Smith, Inc., and its principal place*426 of business was designated as 926 North Center Street, Somerset, Pa. Gilmour Manufacturing Co. (Gilmour Co. or Gilmour) was also a Pennsylvania corporation with its place of business located in Somerset, Pa. Robert A. Gilmour (R.A. Gilmour) operated Gilmour Co. as a proprietorship from 1948 to 1968, when it was incorporated. Thereafter R. A. Gilmour was the sole shareholder and president of Gilmour Co., which was engaged in the business of manufacturing lawn and garden supplies including such items as hose nozzles, lawn sprinklers, and sprayers. Robert M. Smith (Smith) was a certified public accountant maintaining a full-time accounting practice in Johnstown, Pa., prior to December 1970. Smith acquired a controlling interest in the stock of petitioner sometime during 1968 and has been, since at least that time, the president and chief executive officer of petitioner. In connection with his accounting practice, Smith also served as accountant for R. A. Gilmour as well as Gilmour Co. from 1945 through January 1970. On January 20, 1970, R. A. Gilmour and Smith, both acting in their capacities as chief executive officers of their respective corporations, entered into a handwritten*427 memorandum agreement for the sale of substantially all of the operating assets of Gilmour Co. and purchase thereof by petitioner on February 1, 1970, for an aggregate purchase price of $3,500,000. A short time subsequent to this agreement, at the insistence of R. A. Gilmour, the agreement for the sale of assets was altered to a sale of stock of Gilmour Co. by R. A. Gilmour to petitioner. The terms of the stock purchase were essentially the same as had been agreed upon in the initial agreement with the following modifications: The purchase price for the Gilmour Co. stock was increased by $280,550 to a total amount of $3,780,550 to cover the value of certain nonoperating assets owned by Gilmour Co. which were not included in the list of assets bargained for. At the closing of the sale, those nonoperating assets owned by Gilmour Co. which had not been included in the original sale of assets agreement, were to be sold by petitioner to R. A. Gilmour for their book and fair market values aggregating $280,550. Those assets were the land and building where Gilmour Co. maintained its offices and plant and which had a book and fair market value of $192,836.10, certain nonoperating machinery*428 and equipment valued at $71,758,57, and an airplane hangar valued at $15,955.33. The parties additionally agreed that the above-described building and real estate would be leased back to petitioner for an annual rental of $36,000. The effective date of the stock purchase transaction was not altered by the above modification, i.e., it remained February 1, 1970. However, after being advised by counsel that the necessary documentation could not be prepared by February 1, 1970, the parties agreed that closing would occur at the convenience of their respective counsel but the transaction would be effective as of February 1, 1970. The sale was finally consummated on March 24, 1970, at which time all the stock of Gilmour Co. was transferred to petitioner. Contemporaneously therewith, Smith caused Gilmour Co. to sell its real estate to R. A. Gilmour for $192,836.10, and the airplane hangar and miscellaneous machinery and equipment for $86,713.90. R. A. Gilmour then leased the real estate to petitioner for a term of 10 years effective February 1, 1970, at an annual rental of $36,000. The petitioner and R. A. Gilmour also executed an employment agreement hiring the latter as an independent*429 contractor consultant at an annual compensation of $25,000 for a period of 5 years effective as of February 1, 1970. Between Smith and R. A. Gilmour, the sale and purchase of stock was treated by the parties as if it were consummated on January 31, 1970, as initially contemplated in the memorandum agreement for the sale of assets: R. A. Gilmour's salary as president of Gilmour Co. ceased as an officer on January 31, 1970, and he was thereafter paid by petitioner a lesser amount pursuant to the abovedescribed consulting agreement dated March 24, 1970. Petitioner paid R. A. Gilmour rent for the real estate occupied by the business pursuant to a lease dated March 24, 1970, and made effective February 1, 1970, in the amount of $3,000 each for the months of February and March 1970. R. A. Gilmour maintained control of Gilmour Co.'s bank account and paid all liabilities accrued as of February 1, 1970. Smith opened a new bank account into which all receipts of Gilmour Co. were deposited after January 31, 1970. Immediately upon closing of the stock purchase transaction on or about March 24, 1970, petitioner began the liquidation of Gilmour Co., which was completed by March 31, 1970. *430 The fair market values and, where pertinent herein, the useful lives of the tangible assets received by petitioner upon liquidation of Gilmour Co. have been stipulated as follows: AssetsValueUseful lifeAutomobile equipment$ 14,010.005 years S/LDies15,322.007 years S/LFurniture & fixtures12,552.006 years S/LMachinery & equipment542,865.0010 years S/LPrinting plates2,065.004 years S/LInventory360,238.00Accounts receivable554,767.00(Total)($1,501.819.00)Real estate sold toGilmour192,836.10Machinery & equipmentand airplane hangar87,713.90(Total)($280,550.00)(Total)($1,782,369.00)On liquidation of Gilmour Co., petitioner also received cash of $126,114.52 and a receivable of $58,550 for 1969 estimated Federal tax payments. Petitioner assumed liabilities of Gilmour Co. in the amount of $159,451.93. The remaining assets which petitioner received upon liquidation of Gilmour Co. were intangible assets and included 3 a number of patents for hose nozzles, spraying devices, and sprinklers, an invention for packing nozzles for sale, a trademark (Hosemaster), and the right to use the Gilmour name. *431 4On its tax returns for the years at issue petitioner claimed deductions for amortization with respect to the patents and invention based upon an aggregate amount of basis for said assets of $1,833,392.53. Respondent, in notices of deficiency for the taxable years at issue herein, determined that only one patent had an amortizable basis and that the amount thereof was $10,000; respondent assigned no value to, recognized no tax basis in, and allowed no amortization for the remaining patents or the invention. 5*432 The depreciation and amortization deductions claimed by petitioner on its returns and the amounts allowed by respondent with respect to the fiscal years involved herein, are as follows: Fiscal year endedFiscal year endedAugust 31, 1970August 31, 1971ClaimedAllowedClaimedAllowedDepreciation - automotive$32,116.66$19,291.15$78,298.68$45,700.53equipment, machineryand equipment, dies,molds, furniture andfixtures, printingplates, Hosemasterglobe and pylonAmortization of patents65,797.30245.10157,913.52588.23Totals$97,913.96$19,536.25$236,212.20$46,288.76Less: Depreciation andAmortization allowed19,536.2546,288.76Adjustment (amountsdisallowed)$78,377.71$189,923.44The various patents and invention with which we are concerned herein and the products with which they are associated are as follows: U.S. Patent NumberAssociated Product1 D 194,014Pistol-grip nozzle2 3,045,927Jet Speed nozzle3 RE 26,013, et al.Thum Trol nozzle4 3,191,869, et al.Sprayer5 3,207,443Dual barrel spray head6 3,498,543Wave sprinklerInventionNozzle package*433 A brief description of the products covered by the above patents, in layman's language, is as follows: Patent #1 (D 194,014) - Pistol-grip nozzle.--This patent protects the design of a pistol-grip hose nozzle manufactured by Gilmour Co., the distinctive features of which include a flared handle and easy-to-grip control. Patents #2 (3,045,927 et als.) - Jet speed nozzle.--This patent was a mechanical patent protecting the manufacture of a rotary-type nozzle. The distinctive characteristic of this nozzle is that it can be completely opened or closed, so as to control the pattern of water spray, by turning the barrel of the nozzle only one-half turn, i.e., 180 degrees. Patents #3 (RE 26,013 et als.) - Thum-Trol Nozzle.--These mechanical patents protect the manufacture of a barrel-type nozzle which controls the flow of water by a thumb activator, i.e., a slide which looks and operates very much like a slide found on a flashlight. Patents #4 (3,191,869 et als.) - Sprayer.--These patents deal with the spray-head mechanism of spraying devices used primarily in dispensing fertilizers, insecticides, weed killers, or disinfectants. The device controls the amount*434 of the liquid fertilizer or insecticide held in a plastic container attached to the sprayer which is drawn from the container through a plastic tube into the spray head and dispensed therefrom together with the water flowing from the attached hose. Patent #5 (3,207,443) - Dual-Barrel Spray Head.--The product manufactured under this patent is advertised as a dual-barrel acid-cleaning gun. This device is similar to the sprayer covered by Patent #4 except that it has two conduit barrels and two separate spray heads which permits cleaning an aluminum trailer, for instance, with a mixture of the secondary liquid (acid) and water, and then by adjusting the controls, rinsing it off with water alone. Patent #6 (3,498,543) - Wave Sprinkler.--The product manufactured under this patent is an oscillating or wavetype lawn sprinkler. But instead of a rigid bar spray head, this device has a flexible tubular bar head which permits adjustment of both the length and width of the water pattern. Invention - Nozzle package.--This invention, which was not patented at the time of the liquidation of Gilmour Co., provided a method of affixing a nozzle (or similar device) to a display*435 card by means of a plastic button rivet driven through a hole in the nozzle handle and through a hole in the card. This permits a potential purchaser to remove the nozzle from the card to examine it and return it to the card without damage to the card. The more conventional methods of affixing the product to the card by means of tape, wire fasteners, or a plastic covering do not possess this feature. In attempts to establish the proper fair market values for the above-described intangible assets, petitioner presented the testimony of its president, R. M. Smith, and, as its expert witness, Murray V. Johnston; respondent presented the testimony of one expert witness, James P. Burns, Esq. R. M. Smith has had no experience in valuing patents of any type. Smith had no experience in the business of manufacturing or selling nozzles, lawn sprinklers, or sprayers prior to petitioner's acquisition of Gilmour Co., except in connection with his rendering of accounting services to Gilmour Co., R. A. Gilmour, and A. W. Francis Co. (another manufacturer of lawn and garden supplies). Smith has never testified in any proceeding as an expert on the valuation of patents. In December of 1970, *436 in order to allocate the amount of petitioner's adjusted basis in its Gilmour Co. stock to the assets received from the liquidation of Gilmour Co. for the purpose of establishing the respective bases of said assets pursuant to section 334(b)(2), R. M. Smith prepared a schedule of the patents and invention owned by Gilmour Co. on February 1, 1970. On this schedule Smith recorded what he determined to be the fair market values of said patents and invention as of February 1, 1970; the aggregate amount of these values was $2,542,505. However, Smith determined that the available amount of petitioner's adjusted basis 6 in its Gilmour Co. stock, after determining the fair market values of the tangible assets petitioner received on liquidation and allocating a corresponding amount of the adjusted basis to said assets, was less than the amount he had determined constituted the fair market values of the patents and invention. As a result Smith reduced pro rata the amounts allocated to the patents and invention to an aggregate amount of $1,833,392.53. These reduced amounts shown as "value allocated" on the schedule reproduced in the margin, 7*438 were recorded on petitioner's books and records*437 and used by petitioner as bases for purposes of computing deductions claimed for amortization on its returns for the years at issue. In making his determination of the fair market values of the patents and the invention Smith took into consideration the nature of the patent, the selling price of the related manufactured item, and the value to petitioner as he saw it at that time. The technique used by Smith in determining the contested values of most of the items was essentially as follows: Smith first determined what he characterized as a patent's "value per unit" manufactured. He computed this value in most cases by comparing the net selling price of the item manufactured under the particular patent with the net selling price received from the sale of a different model of the same or a similar type item. For instance, patent #6 (3,498,543) pertained to "wave sprinkler" - Model #3,000 had a net selling price of $7.28. Gilmour Co. also manufactured and sold another wave sprinkler, Model #2,800 (apparently not protected by patent) for a net selling price of $5.25. The difference in the net selling prices received for these items is approximately $2.00; Smith determined that this amount was the unit value of products manufactured under patent #6. However, different methods were used in at least two instances: Smith determined a unit value for patent #1 of $.015 by talking to petitioner's employees and estimating a value per unit to petitioner. In determining a value for the invention owned by Gilmour Co., Smith calculated a unit value of $.006 based upon savings of labor cost per item sold resulting from the use of the card packaging invention. After determining a unit value for the particular patent under valuation, Smith multiplied this unit value by the estimated annual sales of the item manufactured to compute an amount characterized as "value per year." Smith estimated the sales for each product manufactured under patent based upon his general knowledge of Gilmour Co.'s sales history 8 and upon information gathered from his discussions with, presumably, key employees about their predictions as to future sales. Smith's computatations were then completed by multiplying the "value per year" by the number of years the particular patent would continue legally enforceable. 9Petitioner called Murray V. Johnston to testify as an expert witness with regard to the valuation of the patents and invention. Johnston is a self-employed financial consultant and financial appraiser. He began offering consulting services in 1961 and was certified as*439 a member of the American Society of Appraisers in 1963 and offered appraisal services thereafter. During the vast majority of Johnston's professional career, from 1928 until 1961, he was an employee of Gulf Oil Corp. During the last 6 years of his association with Gulf he was employed as general credit manager. During Johnston's employment with Gulf he had experience in determining values of intangible assets; this was in connection with appraisals of various businesses that Gulf, at one time or another, was considering acquiring. However, this experience was limited in scope to determining the value of goodwill. During Johnston's period of employment with Gulf, he had no experience in examining and determining the value of patents. Johnston testified that his sole experience with regard to patent valuation has been in connection with his work as a financial appraiser and that since 1963 he has appraised 15 different patents. He has had no previous experience in connection with a transaction involving either the transfer or sale of patents; nor has he ever previously testified as an expert witness in establishing patent values. Johnston's general approach in determining the*440 values of the patents and invention of Gilmour Co. included obtaining and studying the financial reports of Gilmour Co., going to the company's plant and observing the manufacturing process, viewing the company's patented products, and considering Gilmour Co.'s past sales history 10 and Smith's opinion as to future sales. The method used by Johnston to make his evaluations was to estimate the earnings petitioner could realize from royalties if it were to grant exclusive unlimited licenses for the use of the patents for their remaining legal lives as of March 31, 1970. Computations were made using estimated dollar amount of sales of the item covered by the patent for the year 1970, projecting estimated future sales during the life of the patent by applying an estimated annual growth rate (usually 12-1/2 percent compounded per annum) to the preceding year's sales, and then determining the estimated average annual sales during the remaining life of the patent. This was multiplied by the percentage royalty Johnston thought was justified (7-1/2 to 10 percent) to obtain the estimated royalty income value per year. The latter was multiplied by the number of remaining years in the life*441 of the patent to get a gross royalty value of the patent. The gross value was then reduced to present (1970) value by applying what is commonly referred to as "Hoskhold's formula."11With respect to the nozzle packaging invention, which was not patented in 1970, 12 Johnston arrived at a value for this "know how" or invention by determining that this method of packaging would save petitioner $5.20 per thousand units packaged over petitioner's cost of packaging its products under its prior method, *442 and then multiplying the number of packages that would be used over the next 10 years by $5.20 per thousand to arrive at a gross value of the invention, which was then reduced to 1970 value by applying Hoskhold's formula. Johnston determined estimated sales by applying an estimated 12-1/2-percent compounded annual growth rate to the 1970 sales which presumably utilized the package. Since the package was not patented in 1970 Johnston assumed that the value of the package would last 10 years before being replaced by a better method of packaging nozzles and other garden products. At trial respondent called as its sole expert witness James P. Burns, Burns is an attorney specializing in the field of patent law; he is currently the senior partner of a Washington D.C. law firm which limits its practice to patent, trademark, and unfair competition law. Burns has had about 50 years of experience in the area of patent law beginning in the early 1920's with his work as a patent examiner in the United States Patent Office. During his career Burns has served as president of the American Patent Law Association and many professional committees*443 including an advisory committee to the Secretary of Commerce with respect to patents. Burns' experience with respect to patents includes determining fair market values of patents, patent infringements including the assessment of damages arising therefrom, licensing of patents, and advising clients with respect to proper royalty rates to be received or paid upon the sale, licensing, or acquisition of patents. In determining the fair market values of the Gilmour Co. patents Burns took into consideration: The scope of the patent; the prosecution history of the matter being patented to determine whether any part thereof was already in the public domain or was anticipatory or whether any patent claim was given up as a condition precedent to the grant of a new patent; what, if any, competitive products can be marketed royalty-free; and the potential market including the range and magnitude for the patented products and the price range at which the product sells.Burns utilized the same computational formula for determining fair market value of the patents as was used by Johnston, except that the gross values determined were not reduced to current cash values. Burns usually used Johnston's*444 estimated sales for 1970 but, for reasons stated in his appraisal reports including consideration of the abovementioned factors, Burns used a significantly lower estimated compounded annual growth rate of sales to arrive at estimated annual sales of the patented products, and also a lower percentage royalty (usually 3 percent) to determine the royalty value of the patents. With respect to the wave sprinkler (Patent No. 3,498,543), Burns concluded that the design or mechanical improvements covered by the Gilmour patent were pre-empted by a Jepson patent which did not expire until 1977, so this gave the Gilmour patent a negative value for 7 years (to cover the royalty that would have to be paid to Jepson if the sprinkler was marketed), thus reducing the overall value of the patent. With respect to the dual barrel spray head (Patent No. 3,207,443) Burns concluded that it provided nothing new and assigned only a nuisance value to it.And with regard to the nozzle card package, Burns concluded that the patent, when issued in 1972, was invalid and assigned it only a nominal value for going concern "know how." The appraised values of the various patents and invention determined by the three*445 appraisers who testified as to the values of the patents were as follows: Smith Pat. No.ItemJohnstonBurnsSmithreducedD 194,014Pistol-grip$1,136,000$202,246$202,500$145,000nozzle3,045,927Jet Speed18,0007,0003,3253,000nozzleRE 26,013Thum Trol59,00014,745123,95990,000et als.nozzle3,191,869Sprayer366,000127,6561,421,8751,025,000et als.3,207,443Dual Spray-10,0005,00076,00055,000head3,498,543Wave Sprink-278,00068,000510,000365,000lerInventionCard package130,00010,000204,000150,000Total$1,997,000$434,647$2,542,50513$1,833,392.53Gilmour Co. operated a successful business operation. In each of its taxable years since at least 1964 through its liquidation on March 31, 1970, Gilmour Co. operated at a profit. After its liquidation, petitioner uninterruptedly continued the business operation of Gilmour as a division of R. M. Smith, Inc., and continued to use the trade*446 names of Gilmour and Gilmour Co.Petitioner acquired a substantial customer list from Gilmour and continued to use substantially the same sales representatives for its products as had Gilmour Co. prior to its liquidation. Prior to the stock acquisition by petitioner, Gilmour Co. sold its products under the trademark of "Hosemaster." Upon the liquidation of Gilmour Co. petitioner acquired the "Hosemaster" trademark and has, to a certain extent, continued its use. The "Hosemaster" trademark is displayed prominently on petitioner's sales catalogues, and on its sales display packages for pistol-grip, jet-speed, and thum-trol nozzles as well as the display packages for the various sprinklers marketed by petitioner. In addition, the trademark "Hosemaster" is displayed on a globe which is attached to the top of a large pylon that stands outside petitioner's manufacturing plant and can be seen from the Pennsylvania turnpike. The corporate income tax return of Gilmour Co. for the period July 1, 1969 to March 31, 1970, was prepared by Robert M. Smith. Said return did not report any income from the recapture of depreciation and investment credit previously taken by Gilmour Co. with respect*447 to certain assets owned by it which were distributed to petitioner upon liquidation.Petitioner has conceded that Gilmour Co. should have reported income from the recapture of depreciation and investment credit on its final return. Smith has had an extensive background in a tax and accounting practice. Smith began work as an accountant with the Pittsburg office of Haskins & Sells in December 1938. From July 1941 through March 14, 1948, Smith practiced public accounting with the firm of Davies-Silverstone & Co. in Johnstown, Pa.Smith became a certified public accountant in the State of Pennsylvania in 1945. In his accounting practice Smith represented clients in over 100 cases with the Internal Revenue Service at various levels. And as a CPA and tax practitioner, Smith was cognizant of the depreciation and investment credit recapture provisions of the Internal Revenue Code. A depreciation recapture issue was involved in one of the cases in which Smith represented a client before the Internal Revenue Service. Smith testified that he hastily prepared the income tax return of Gilmour Co. for the period ended March 31, 1970. ULTIMATE FINDINGS OF FACT The fair market values*448 of the patents and invention received by petitioner in liquidation of Gilmour Co. were as follows: Pat. No.ItemFMV1 D 194,014Pistol-grip nozzle$355,0002 3,045,927Jet speed nozzle11,0003 RE 26,013 et als.Thum Trol nozzle25,0004 3,191,869 et als.Sprayer220,0005 3,207,443Dual sprayhead9,0006 3,498,543Wave sprinkler125,000InventionCard package115,000Total$860,000Upon the liquidation of Gilmour Co. petitioner received valuable intangible assets including a trademark, goodwill, and going concern value. Petitioner failed to prove that the underpayment of tax by Gilmour Co. for the taxable period beginning July 1, 1969, and ending March 31, 1970, was not due to negligence or intentional disregard of rules and regulations. The following findings of fact are made to reflect concessions of the parties on certain issues: 1. Gilmour Co. is entitled to deductions for rent expense of $6,000 and a consultant fee of $4,000 paid to Robert A. Gilmour during the period ending March 31, 1970. 14*449 2. Gilmour Mfg. Co. is not entitled to a deduction for depreciation in the amount of $646.87 for the period ended March 31, 1970. 3. Depreciation in the amount of $189,950.16 for the period ended March 31, 1970, should have been recaptured by Gilmour Mfg. Co. under section 1245 as gain taxable as ordinary income upon the liquidation of said company. 4. Gilmour Mfg. Co. should have recaptured investment credit in the amount of $13,596.34 for the period ended March 31, 1970, upon the liquidation of Gilmour Mfg. Co. as there was a disposition of section 38 property within the meaning of section 47. 5. Petitioner is entitled to deductions of $6,515.73 and $5,572.71 for "interest expense - others" in the fiscal years ended August 31, 1970, and August 31, 1971, respectively. 6. Petitioner is entitled to deductions of $5,962.69 and $7,863.31 for "interest expense - stockholders" in the fiscal years ended August 31, 1970, and August 31, 1971, respectively. 7. Petitioner did not have dividend income of $280,550 from Gilmour Mfg. Co. on or about March 24, 1970. 8. Petititioner is not entitled to a dividend received deduction of $238,467.50 for the year 1970 as set*450 forth in the notice of deficiency, as respondent conceded that petitioner did not have dividend income of $280,550. 9. Gilmour Mfg. Co. did not have a gain on sale of machinery and equipment, building and landscaping, and airplane hangar in the amount of $12,360.42 in 1970. OPINION We must decide two questions herein: (1) Whether petitioner overstated deductions for depreciation or amortization of patents and an invention claimed on its corporate tax returns for fiscal years ended August 31, 1970 and August 31, 1971; and (2) whether Gilmour Co. is liable for an addition to tax under section 6653(a) for the taxable period July 1, 1969 to March 31, 1970.Effective February 1, 1970, petitioner purchased all of the stock of Gilmour Co. from R. A. Gilmour and soon thereafter began the liquidation of Gilmour Co., which was completed on March 31, 1970. Petitioner paid $3,500,000 for all the stock of Gilmour Co., plus the fair market value of certain nonoperating assets of Gilmour Co. which were immediately sold to R. A. Gilmour at the same fair market value. Upon the liquidation of Gilmour Co. petitioner allocated the $3,500,000 purchase price of the stock among the assets received*451 by petitioner as a result of the liquidation of Gilmour Co. Petitioner allocated to the tangible assets received, and to the inventory and accounts receivable, a total of $1,615,400.19, and the balance of the purchase price, or $1,884,599.81, to certain patents and an invention owned by Gilmour Co. at the time of the liquidation. Petitioner allocated nothing to intangibles such as goodwill, tradename, and going concern value. On its income tax returns for the periods ending August 31, 1970 and 1971, petitioner claimed deductions for amortization of the patents and invention, using as a tax basis the values allocated thereto as above indicated. Upon audit of those returns respondent determined that petitioner had a tax basis of only $10,000 in one of the patents and no basis in the others and disallowed all but a small amount of the patent amortization deductions claimed by petitioner.The parties have stipulated the values of the tangible assets, accounts receivable and inventories received by petitioner on the liquidation of Gilmour Co., which total $1,501,819. Hence, the principal issue remaining for our determination is the fair market value of the patents and invention, and*452 if that together with the stipulated value of the tangible assets, accounts receivable, and inventories is less than the purchase price of the stock, whether the balance should be allocated to goodwill and other nondepreciable intangible assets or to the depreciable and amortizable assets. Petitioner also failed to include in the final return of Gilmour Co. recapture of depreciation mandated by law, and the secondary issue remaining for our decision is whether the underpayment of tax resulting therefrom was due to negligence or intentional disregard of rules and regulations so as to make the addition to tax imposed by section 6653(a) applicable.Section 167(a) 15 provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, including obsolescence, of property used in a trade or business. For purposes of this case, as is indicated in the regulations, see sec. 1.167(a)-1, Income Tax Regs., the amount of the allowable deduction for depreciation is computed with respect to the basis and useful life of each particular asset. Gilmour Co. was liquidated tax free in accordance with section 332 and it is uncontested that petitioner's basis*453 in the assets thus received is governed by section 334(b)(2). Under section 334(b)(2) 16 the basis of the property received in liquidation by petitioner is petitioner's adjusted basis in the Gilmour Co. stock with certain adjustments thereto as prescribed in the regulations. Under section 1.334-1(c), Income Tax Regs., the aggregate basis in the assets received by petitioner is the cost of the Gilmour Co. stock reduced by the amount of cash received and increased by the liabilities assumed or subject to which the property was received. 17 After the prescribed adjustments are made to the adjusted basis, said aggregate basis is then allocated among the various assets received in the liquidation (except cash and its equivalent) both tangible and intangible, ordinarily in proportion to the net fair market values of such assets on the date received, see sec. 1.334-1(c)(4)(viii), *454 Income Tax Regs., and as such constitutes the individual basis for each asset in the hands of the petitioner. *455 Petitioner now contends that the aggregate fair market value of the patents and invention as of March 31, 1970, was $1,997,000, Johnston's aggregate appraisal figure. Upon petitioner's argument, the portion of petitioner's adjusted basis in the Gilmour Co. stock, as finally adjusted, which was not allocated to the tangible assets is allocable to the patents and invention in proportion to their respective fair market values. Furthermore, petitioner apparently contends that after the aggregate basis has been allocated to the tangible assets and to the patents and invention under section 334(b)(2), if any amount thereof remains it should be reallocated pro rata among all of the assets both tangible and intangible in accordance with their respective fair market values.Respondent now contends, based on the testimony and valuation report of his expert witness, James Burns, that the aggregate fair market value of the patents and invention, as of March 31, 1970, did not exceed $434,647, that petitioner received additional valuable intangible assets from the Gilmour Co. liquidation including a trademark and goodwill, and that the remaining part of the stock purchase price should be allocated*456 under section 334(b)(2) to these nondepreciable intangible assets. Respondent proposes that, for purposes of allocating the basis to the assets received from Gilmour Co., we should adopt a so-called "residual appraisal method," i.e., basis is allocated to depreciable assets according to their respective values and the remaining or residual amount of basis is allocated to nondepreciable assets. We agree with respondent that petitioner improperly overvalued and allocated an excessive amount as basis to the depreciable intangibles received in liquidation and in fact received valuable nondepreciable intangible assets to which a portion of the available amount of basis should have been allocated pursuant to section 334(b)(2) and the regulations thereunder. We also agree with petitioner, however, that respondent's allocation of only $10,000 of that basis to the patents and invention was arbitrary and unreasonable and that the presumption of correctness which normally attaches to respondent's determination is not applicable with regard to this issue. This leaves us with the burden of determining the value of these patents and the invention, which at best is a will-o-the-wisp exercise, *457 from the evidence presented during the trial of this case, without support of a burden-of-proof rule. We have described in some detail in our findings of fact the approaches taken by the three witnesses in determining the values of these assets, the mechanics used to carry out those approaches, and the amount of the values so computed. While the testimony and appraisal reports of those witnesses were helpful, after a careful review of all of the evidence presented herein, we have concluded that the parties have overstated their cases, and, as a result, have exaggerated their appraisals. Consequently, in making our determination, we have not sustained either of the parties' valuations because we believe the answer lies somewhere between the two extremes and have made our findings accordingly. At the outset we note that the opinion evidence submitted was somewhat less than exemplary. Our basic criticism of the evaluation reports concerns the data upon which the reports are based and from which the conclusions contained therein were necessarily drawn; they seen to us unduly speculative. We recognize that the process of making determinations of value is by its nature speculative*458 and that the subject matter concerned herein, patents, which by their nature are unique, serves to exacerbate the uncertainties inherent in an evaluation determination (see Simmons Company,8 B.T.A. 631, affd. 33 F.2d 75 (1st Cir. 1929), cert. denied 280 U.S. 588 (1929)). Nevertheless, conjecture should be kept to a minimum by establishing, where possible, a firm factual foundation from which necessary projections can be made with some degree of confidence. In this case both parties' experts made their evaluations of the patents on the basis of projected future earnings. These projections, which theoretically represent a consideration of the reasonable prospects for the future, were, in turn, based upon the earnings history of Gilmour Co. for the 5-year period immediately preceding March 31, 1970. However, the historical earnings figures used by the experts 18 as the basis for their projections were in fact estimates made by R. M. Smith and did not represent actual historical data in which earnings or sales from products were segregated to reflect those amounts related to specific patents. Moreover, the figures from which Smith made*459 his estimates did not even reflect a distinction between sales of nonpatented products from those manufactured under patent. There was testimony at trial to the effect that production records of Gilmour Co. do exist and are and were available. We do not know how informative such records might be nor what time periods they may reflect but it is clear that no such records were resorted to in compiling the valuation reports submitted herein. 19*460 By our criticism we do not mean to cast aspersion on either of the parties' expert witnesses. Clearly, Burns, respondent's expert, is an attorney of great stature in his field and a review of his accomplishments and professional contributions is indicative of this fact. Moreover, Burns' experience in advising clients as to the fair market values of various patents evidence his competency to testify as an expert witness in this proceeding. Petitioner's expert, Johnston, although not possessing much experience in evaluating patents, is a senior member of the American Society of Appraisers and testified as an expert herein without objection from respondent. Furthermore, the methods used by these experts to evaluate the patents, which methods were essentially the same, represented appropriate means by which to determine fair market values--attempts to determine at what price the patents would change hands between a willing buyer and seller. See Bendix Engineering Works, Inc.,23 B.T.A. 1049 (1931); Nice Ball Bearing Co.,5 B.T.A. 484 (1926); Harry W. Bockhoff,3 B.T.A. 560 (1926). However, we find the method used by petitioner's*461 president, R.M. Smith, to evaluate the patents wholly unacceptable, having no apparent relation to what a willing buyer and seller might agree upon at arm's length. At first blush it may seem incongruous to ignore the testimony of the individual who negotiated the purchase of Gilmour stock on behalf of petitioner. However, the transaction which Smith negotiated was a lump-sum purchase of stock of a profitable ongoing business, payable in installments. Such experience does not necessarily indicate Smith's capability of accurately determining the fair market values of the patents. It should be clear, however, that our refusal to give weight to Smith's testimony with respect to the valuation of the patents is not predicated upon a finding that he is incompetent to give such testimony. Rather, our decision was made after reviewing his testimony as to the method he used to determine such values. The method Smith used was described earlier in our fact findings and further discussion thereof is unwarranted except to say that generally it consisted of comparing the net sales price of the product manufactured under the particular patent being evaluated with the net sales price of a similar*462 product which is either manufactured under another patent or without patent protection. From this comparison, Smith determined the sales price differential and treated this amount, called "unit value," as the royalty petitioner would receive if the patent were licensed. We fail to see any logical relationship between differences in prices of items manufactured and sold by petitioner and the royalty amount another manufacturer would pay to obtain the right to manufacture and sell a patented item. 20Furthermore, as sole owner of petitioner, it was very much to Smith's advantage to allocate the largest part of the basis available to those patents which had the shortest remaining lives for amortization deduction purposes. To illustrate, we note that on the final return of Gilmour Co. for the period July 1, 1969 to March 31, 1970, gross profit on sales was reported as $959,609.14 and taxable income was reported as $303,053.04, whereas on the return of petitioner*463 for the period September 1, 1970 through August 31, 1971, gross profit on sales from the Gilmour division was reported to be $1,012,102.82, operating expenses of that division, including an amortization deduction of $157,913.52, were reported as $993,933.06, and net operating income was reported as $18,169.76.We are also curious to know why Smith did not give us some information concerning Gilmour's breakdown of his $3,500,000 original asking price for the operating assets of Gilmour Co.; and in fact why Gilmour was not called as a witness. Under the circumstances we can give little weight to Smith's valuation of the patents and invention. Johnston determined an aggregate fair market value for the six patents under examination of $1,867,000. In determining the values of the patents, generally Johnston used royalty rates of 10 and sometimes 7-1/2 percent and projected future sales over the remaining lives of the patents based on an assumed annual sales increase of 12-1/2 percent. Burns determined an aggregate gross fair market value for the patents of $424,647. Burns assigned only a nominal value to some of the patents and to others he applied a 3-percent royalty rate to the*464 average of sales during the lives of the patents assuming a 6 - 6-1/2-percent annual compounded growth rate. Neither of the parties has brought to our attention, nor have we discovered, an established royalty rate or range thereof applicable to lawn and garden supplies or equipment. However, it seems to us rather clear that the rates chosen by Johnston were excessively high. None of the patents under evaluation were basic, conferring a monopoly of commercial importance. Rather, each of the patents contained claims which were improvements to the existing art and in most cases rather narrow. Garden City Feeder Co.,35 B.T.A. 770, 780 (1937); Keystone Steel & Wire Co.,16 B.T.A. 617, 621 (1929); Cheatham Electric Switching Device Co.,1 B.T.A. 984, 988 (1925). At trial Johnston cited an example in which a 10-percent royalty was paid for the rights to a patented invention. However, the example chosen involved a very sophisticated invention in the electronics industry the sales of which yielded a 40-percent net profit before taxes. Obviously, petitioner's patents, design and mechanical, relating to hose nozzles and sprayers, do*465 not compare favorably with such highly sophisticated electronic devices. 21However, the royalty rates applied by Burns were too low. In most instances weighing heavily in his selection of appropriate rates was his opinion that the validity of a number of the patents was open to serious question. We believe this was an erroneous guide for choosing an appropriate royalty rate. In cases wherein the value of patents was sought to be determined courts have generally reacted negatively to evidence or opinions of their invalidity in the absence of evidence of infringement litigation. In the case of B.F. Sturtevant Co. v. United States,18 F. Supp. 28, 33-34 (D. Mass. 1937), the court refused to receive evidence, similar to that cited by Burns as support for his opinion, as to the validity of patents, on the grounds that such*466 evidence was immaterial. In Joseph H. Adams,23 B.T.A. 71, 103 (1931), we rejected a similar attack on certain patent applications indicating that "* * * we must accept the patents as valid * * *" and that a "* * * collateral attack may not be made in this proceeding upon the action of the Patent Office * * *." And in Syracuse Food Products Corporation,21 B.T.A. 865, 885 (1930), we rejected one expert's valuation as too low because it was based upon his opinion that the patents under consideration therein were invalid. We explained: "We have no reason to believe that the question of doubtful validity would have been present in the mind of a prospective purchaser of these patents to any greater degree than might be reasonably anticipated in any ordinary case of a purchase and sale of patents." Cf. Zouri Drawn Metals Co.,8 B.T.A. 853, 855 (1927); and Van Kannel Revolving Door Co.,11 B.T.A. 1209, 1213 (1928). With respect to the projections made by the expert witnesses of the average estimated future sales attributable to the patents, once again Johnston was overly optimistic and Burns unduly pessimistic. As*467 pointed out in our earlier criticism, the so-called historical sales figures of patented products were somewhat suspect and that must be taken into account in determining a reasonable estimate. Additionally, we think unrealistic an assumption that sales of patented products such as these will grow by 12-1/2 percent each year over the patents' remaining lives as Johnston has assumed. Although Gilmour Co.'s average growth rate for all sales was 11-1/2 to 12-1/2 percent during the 5-year period immediately preceding March 31, 1970, i.e., 1965-1969, we believe it more reasonable to presume that the sales of inexpensive items covered only by improvement patents would be more likely to decline towards the end of the patents' legal lives, especially where, as here, fierce competition exists and is likely to increase, and that this fact should not be overlooked in making a valuation determination. Also Johnston's projection gave no recognition to the effect Gilmour Co.'s tradename, "Hosemaster" and its place in the market might have had on sales of the patented items. On the other hand, Burns, in his valuations simply rejects the sales figures used by Johnston and arbitrarily selected*468 much lower amounts. Even though we have criticized the source of the sales figures Johnston used, there was credible testimony at trial supporting the fact that Gilmour enjoyed substantial sales of its patented products.And it is clear that Gilmour Co. had considerable overall sales and was a profitable enterprise; Burns' determination did not give sufficient weight to these facts. Burns was correct in focusing attention to the competition that petitioner would face in marketing its patented products. Nevertheless, the fact is that the competition which Burns cited had existed prior to March 31, 1970, and yet Gilmour still enjoyed considerable sales success. Consequently, we believe Burns overemphasized the effect of petitioner's competition. We also believe that the effect upon Burns' opinion as to the validity of the various patents was pervasive in his evaluations and have taken this into consideration. There is one other factor which we believe has some unquantifiable degree of significance in evaluating these patents: The fair market values determined by Burns were gross amounts, 22 i.e., not reduced to current cash values, and yet respondent, while using the method of*469 projecting estimated earnings over the lives of the patents to establish accurate values, a method which is meaningless unless the gross amounts are reduced to current values, urges us to sustain these gross amounts. We believe implicit in this situation is the fact that respondent recognizes the potential for error in his determination and that such error has been resolved in his favor. After giving careful consideration to testimony received, the valuation reports submitted, and the parties' arguments on brief, we have done the best we could to make a reasonable determination of the fair market value of the patents as of March 31, 1970, and, using the same approach used by Johnston and Burns, have computed an aggregate amount of $745,000, delineated as follows: Patent No.1 Pistol-grip nozzle$355,0002 Jet-speed nozzle11,0003 Thum-Trol nozzle25,0004 Sprayer220,0005 Dual-barrel spray head9,0006 Wave sprinkler125,000$745,000*470 We do not understand respondent to contest the use of the respective remaining legal lives of the above patents, as of March 31, 1970, as their useful lives for purposes of amortization by petitioner and accordingly we so hold. To this point our discussion has not encompassed the valuation of the "carded nozzle packaging invention" received by petitioner from Gilmour Co. We have delayed such discussion until now because we believe that, by the nature of the subject matter, this asset should be considered separately from the patents. In the context of this proceeding the value of certain property is sought, as of March 31, 1970. Necessarily, the property rights under consideration must be examined as of that date. Under the facts herein, prior to its liquidation, Gilmour Co. did not possess any statutory patent rights with respect to the carded nozzle packaging process.Rather, as of March 31, 1970, Gilmour possessed and transferred to petitioner only a right, recognized under common law, to make, use, sell, and otherwise enjoy this invention. See Patterson v. Kentucky,97 U.S. 501, 507 (1878). Therefore, we proceed to examine the evidence with respect to*471 the value of this carded nozzle packaging invention with the understanding that as of March 31, 1970, the property right received by petitioner was the above-described common law inventor's right. Johnston determined that the fair market value of this invention was $130,000. He computed this amount on the basis of the expected labor cost savings to be realized over a 10-year period in packaging pistol-grip nozzles, and reduced the amount of the estimated savings to current cash value as of March 31, 1970. Burns determined a nominal value of $10,000 for this invention for the most part due to the numerous competitive packaging methods. Reasonably anticipated labor cost savings resulting from the implementation of a patented invention have been found to be an appropriate basis for determining a value for such an invention. Westclox Co. v. United States,37 F. 2d 191 (Ct. Cl. 1930). However, as that case points out the savings from which the value is determined is the amount of savings the petitioner will realize in comparison with the costs incurred by its competitors under the methods they use to package their products. See Westclox v. United States,supra at p. 195;*472 cf. Keystone Steel & Wire Co.,supra at p. 621. Petitioner's valuation of this invention was not based upon comparative cost savings nor may it be safely assumed that petitioner's competitors used petitioner's old method for packaging their products or that they incurred the same labor costs as did petitioner. Nevertheless, we are of the opinion that this carded nozzle package developed by Gilmour Co. had inherent value to petitioner as of March 31, 1970.Not only did it save petitioner labor costs but it had a marketing appeal. By use of this device petitioner's products could be displayed on the sales floor in a manner that would permit potential customers to remove the product from the card to examine it and then to replace it without damage to the card. The competitive packages which employed either staples or plasticized coverings did not have this advantage.In 1970 Gilmour Co. had the going concern "know how" to utilize this device and whether it obtained a patent on the device or not would relate more to the length of time petitioner could enjoy the marketing advantage than its value to petitioner in 1970. Taking all factors into consideration, we find*473 that the fair market value of the carded nozzle packaging invention as of March 31, 1970, was $125,000. Consideration of the proper period over which petitioner's basis in the invention may be amortized is a bit more complicated than that necessary with respect to the patents discussed supra, although neither party makes specific reference to this factor on brief. We recognize that it has been held that a patent application has no definite period of useful life and is not the proper subject of exhaustion, Hershey Manufacturing Co.,14 B.T.A. 867, 873 (1928), affd. 43 F. 2d 298 (10th Cir. 1930), and that it can be argued that the life of a common-law inventor's property right is likewise indeterminable. However, we believe the carded nozzle invention had a limited life probably shorter than the life of most patents.As of 1970 we would accept Johnston's estimate of 10 years and hold that petitioner is entitled to a deduction for amortization of the value we have allocated to the invention based on a 10-year life. We make no determination with respect to the rate of amortization that would be applicable if the invention is patented. Having determined*474 that the aggregate fair market value of the patents and invention received by petitioner from Gilmour Co. was $860,000 as of March 31, 1970, one further question remains with respect to the proper allocation of basis under section 334(b)(2). As discussed supra, section 334(b)(2) and the regulations thereunder require an allocation of petitioner's adjusted basis in the Gilmour Co. stock among all of the assets petitioner received in liquidation in accordance with their respective fair market values. As a result of the parties' stipulation and their respective concessions as to the tax liability of Gilmour Co. asserted against petitioner herein as transferee, the parties may compute the correct amount of petitioner's adjusted basis in the Gilmour Co. stock under the Rule 155 computations. The parties have stipulated the fair market values of all the tangible assets received by petitioner, and we have determined the fair market values of the patents and invention received. However, the sum of the fair market value of these assets clearly will be less than the amount of the adjusted basis when finally calculated and a controversy exists as to what this amount represents and*475 as to how it is to be treated in this proceeding. Respondent contends that upon the liquidation of Gilmour Co. petitioner received valuable assets, in addition to the tangible assets and the patents and invention already enumerated, namely a trademark and goodwill. Respondent argues that the residual amount of petitioner's adjusted basis in the Gilmour stock not absorbed by the value of the patents and invention, the value of the tangible assets, and the amount of cash received in the liquidation is attributable to the value of said intangible assets in accordance with the so-called residual method of valuing goodwill. Petitioner vigorously contests respondent's position. Petitioner argues that although a trademark and certain assets, which have been recognized in the past as indicia of goodwill, were received from Gilmour, those assets were of nominal value only. And, although petitioner steadfastly maintains that we should sustain its asserted valuation of the patents and invention, petitioner belatedly argued that if we should decide that the fair market values of the patents and invention were of lesser amounts than petitioner has claimed, nevertheless, the value of the*476 trademark and goodwill should not be determined under the residual method. Rather, petitioner urges, as best we can understand it, that a specific determination of the fair market value of the trademark and goodwill must be made, which petitioner maintains would leave a portion of petitioner's adjusted basis in Gilmour Co. stock to be reallocated among all of the liquidated assets in proportion to their respective fair market values. Notwithstanding its argument to the contrary, we find that upon the liquidation of Gilmour Co. petitioner received intangible assets of substantial value to which it erroneously failed to assign any portion of its basis, as adjusted, in the Gilmour stock. Consequently, we have no doubt that the amount of depreciation and amortization claimed by petitioner for the tax years in question was excessive. Furthermore, we hold that under the facts of this case the aggregate value of the previously unaccounted for intangible assets is to be determined under the residual method of valuation as argued by respondent. Not only do we find that the residual method of valuing those intangible assets is appropriate under the circumstances of this case, but we also*477 believe that the evidence justifies the value that will be allocated to those assets under such method. As noted in our findings of fact, petitioner received in the liquidation an on-going profitable business that had been marketing lawn and garden equipment for a number of years under the name "Gilmour Manufacturing Co." and the tradename "Hosemaster." After the liquidation petitioner continued the same business in the same markets identifying its products by the names "Gilmour Manufacturing Co." and "Hosemaster." Despite Smith's testimony to the contrary, we believe it is obvious that those names and the products identified therewith were well and favorably known to the users of lawn and garden equipment and promoted sales of these products. It matters not whether petitioner sold its products through jobbers or direct to the consumers--the fact that sales to consumers were promoted by these names and the position of Gilmour Co. in the market would filter through the jobbers to constitute a valuable asset, goodwill, of Gilmour Co. which petitioner acquired and used.The fact that petitioner retained most of the customers of Gilmour Co. bolsters that conclusion, even though those*478 customers were jobbers for the most part. Gilmour Co.'s marketing program for its products included the use of sales representatives in numerous States, in Canada, in Venezuela, and one representative for other countries.These representatives were responsible for ensuring that petitioner's products were carried by various jobbers and hundreds of retail outlets throughout the United States and elsewhere. To attribute the success of Gilmour to the patented products and ignore the effect of good management and a good marketing program is erroneous. As we commented in Cheatham Electric Switching Device Co.,1 B.T.A. 984, 988 (1925): We are unable upon consideration of the evidence in this appeal to agree with the taxpayer that its earnings are and were attributable entirely to its patents. No one of its patents covered a basic principle, and other manufacturers were, and are, free to use the same principle used by Cheatham, so long as the devices manufactured by them do not infringe upon the Cheatham device. Other devices capable of performing the same service, but not infringing upon the Cheatham device, were produced, marketed, and placed in operation, and we*479 therefore conclude that the taxpayer's earnings were not only due to the patents it owned, but largely to good management and the ability of its salesmen to market its product in the face of competition. See also Auto Specialties Manufacturing Co.,9 B.T.A. 455, 458 (1927). Although the trademark, goodwill, and going-concern value acquired by petitioner are separately identifiable assets, they are all nondepreciable. Clarke v. Haberle Crystal Springs Brewing Co.,280 U.S. 384 (1930); Norwich Pharmacalco.,30 B.T.A. 326 (1934); Northern Natural Gas Co. v. United States,470 F. 2d 1107 (8th Cir. 1973), cert. denied 412 U.S. 939 (1973); and sec. 1.167(a)-3, Income Tax Regs. Consequently, in the context of this case where we are seeking assets' fair market value for purposes of a section 334(b)(2) allocation, we see no need to determine separate values for these assets. Petitioner's argument that this case does not present an appropriate occasion to value these assets under the residual method is erroneous. Indeed, the facts of this case present the exact situation wherein the residual valuation method*480 has been held to be applicable. Jack Daniel Distillery v. United States,379 F. 2d 569, 579 (Ct. Cl. 1967). In general terms, section 334(b)(2) attempts to equate a corporate acquisition of stock followed by a liquidation of the subsidiary with an outright acquisition of the underlying assets of such a corporation. Boise Cascade Corp. v. United States,288 F. Supp. 770 (D. Idaho 1968), affd. per curiam 429 F. 2d 426 (9th Cir. 1970). Cf. Argus, Inc.,45 T.C. 63 (1965); and Cabax Mills,59 T.C. 401 (1972).23 The petitioner's basis as adjusted in the Gilmour Co. stock is the best evidence of the fair market value of the assets acquired.24This aggregate fair market value is fractionalized under the regulations, see sec. 1.334-1(c)(4)(viii), Income Tax Regs., and allocated among all of the assets acquired in liquidation. Since we have found that petitioner received the valuable nondepreciable intangible assets enumerated above and since the petitioner's basis, as adjusted, in the Gilmour Co. stock and the fair market values of all other assets acquired in the liquidation have been or may now be determined, *481 we hold that the value of the nondepreciable intangibles is to be determined under the residual valuation method. Jack Daniel Distillery v. United States,supra;Philadelphia Steel & Iron Corp. v. Commissioner,344 F. 2d 964 (3d Cir. 1965), affg. per curiam a Memorandum Opinion of this Court; Copperhead Coal Company v. Commissioner,272 F. 2d 45 (6th Cir. 1959), affg. a Memorandum Opinion of this Court; Florida Publishing Co.,64 T.C. 269 (1975), on appeal (5th Cir. Aug. 21, 1975); see Saline Motor Co.,22 B.T.A. 874 (1931); see Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 11.45 at 11-44 (3d Ed. 1971). The final issue for decision is whether Gilmour Co. is liable for the addition to tax under section 6653(a) for the taxable period July 1, 1967 to March 31, 1970. The final corporate tax return for Gilmour Co. failed to include the income realized under section 1245, from recapture of the depreciation previously taken with*482 respect to certain assets which were distributed to petitioner in the liquidation of Gilmour Co. R. M. Smith prepared and filed Gilmour Co.'s final return; Smith signed the return in his capacity as president of Gilmour Co. and also signed the name of his accounting firm, Smith & Martin, as preparer. Respondent determined that the failure of Gilmour Co. to report the income from depreciation recapture was due to negligence or intentional disregard of rules and regulations. Section 6653(a)25 imposes an addition to tax in an amount equal to 5 percent of the underpayment if any part thereof is due to negligence or intentional disregard of rules and regulations. The taxpayer has the burden of proving that the assertion of the section 6653(a) addition to tax is erroneous. David Courtney,28 T.C. 658, 669 (1957). Petitioner makes two arguments against imposing the section 6653(a) addition to tax: (1) Since the recapture provisions do not normally apply to nontaxable transactions such as a section 332 liquidation, applying normal tax reasoning one would conclude that section 1245 was inapplicable under the facts at bar because such a tax would be borne by a corporate*483 owner who did not receive the benefit of the deduction; (2) as a CAP, Smith was sufficiently aware of Internal Revenue Service procedures to know that the final tax return of Gilmour as well as petitioner's initial return filed subsequent to the Gilmour liquidation would both be audited as a matter of course so that technical compliance with all provisions would be expected.Petitioner's arguments are without merit. Smith carried on a full-time accounting practice through April 15, 1970, and in his capacity as a CPA had experience with the recapture provisions of the Code. He had prepared the returns for Gilmour Co. on which the accelerated depreciation was claimed. Furthermore, *484 the only evidence offered to explain the failure to report the depreciation recapture on Gilmour Co.'s final return was Smith's testimony that the return was hastily prepared. Gilmour Co. cannot thus escape responsibility for its duty to file accurate tax returns. See Vern W. Bailey,21 T.C. 678, 687 (1954).Under the facts of this case such a statement itself may prove negligence. 26 See Marcello v. Commissioner,380 F. 2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part a Memorandum Opinion of this Court. At any rate, petitioner has clearly failed to meet its burden of proof on this issue. See David Courtney,supra, and Gavin S. Millar, 67 T.C. (Jan. 10, 1977), and we hold for respondent on this issue. Decision will be entered under Rule 155.* Footnotes1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩2. Petitioner conceded the deficiency in corporate income tax of Gilmour Manufacturing Co. and that it was liable for the deficiency as transferee.↩3. The question as to whether petitioner received goodwill from Gilmour Co. upon its liquidation is discussed infra.↩ It should be noted, however, that petitioner has taken the position on its returns, at trial, and on brief that it received no goodwill from Gilmour Co. 4. The total cost for the intangible assets reflected on Gilmour Co.'s books was $10,000 which it had paid for a patent.↩5. Respondent, since trial, has taken the position that the aggregate value of the patents and invention for purposes of amortization is no more than $434,647. See discussion infra.↩ Respondent's theory is that the excess of the purchase price of the stock over the stipulated values of the tangible assets and the values he allocates to the patents received by petitioner on liquidation of Gilmour Co. should be allocated to "residual goodwill." Petitioner takes the position that the excess of the purchase price of the stock over the stipulated value of the tangible assets should be allocated to the patents or other depreciable assets, that the trademark and Gilmour name had no value, and that the Gilmour Co. had no goodwill of value to petitioner.6. Under sec. 334(b)(2) and the pertinent regulations the total combined amount of a parent's basis in all of the assets received from the subsidiary in liquidation is the parent's adjusted basis, as further adjusted, in the stock of the subsidiary. ↩7. GILMOUR MANUFACTURING COMPANYPATENTSJanuary 31, 1970PERIODVALUEPATENT #DESCRIPTIONISSUEEXPIRESCATALOG #PER UNIT1. Des 194,014Hose nozzle11-6-6211-6-76562,563.01-1/2all nozzlesfor sprayers2. 3,045,927Spray nozzle7-24-627-24-79520.01Des 189,411Spray nozzle12-6-6012-6-74520.005666,308Spray nozzle7-9-637-9-83See #(Canadian)(jet speed3,045,927nozzle)above3. RE 26,013Hose nozzle1-8-631-8-80TT 65.25(thum trol)Des 202,686Hose nozzle10-26-6510-26-79TT 65(thum trol)4. 3,191,869Spraying de-6-29-656-29-823621.25(2,754,152vice havingalso pro-restrictedtects #362)oriface &expansionchamberconstruction3,112,884Spraying de-12-3-6312-3-80not beingvicemfg'd3,090,564Spraying de-5-21-635-21-80484 pro-1.252,788,245 *vice with di-tected by2,788,244 *lution controlthis patent5. 3,207,443Dual spray9-21-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,62S1.50head having vent62SHcontrol means6. 3,498,543Wave sprink-3-3-703-3-873000 plus2.00lerothers laterInventionCarded nozzlenonenoneall nozzles.006packaging(Machine)Total↩Est. SalesValueRemainingTotal$ ValuePer YearPer YearLife Yrs.$ ValueAllocated1. Des 194,0142000M30,0006-8/12202,500145,000.002. 3,045,927350003509-4/123,3253,000.00Des 189,411350001754-8/12846392.53666,308(Canadian)3. RE 26,01350M10,0009-9/12123,95990,000.00Des 202,6864. 3,191,86950M62,50012-3/12776,042560,000.00(2,754,152also pro-tects #3623,112,8843,090,56450M62,50010-4/12645,833465,000.002,788,245*2,788,244*5. 3,207,4434M4,50012-6/1276,00055,000.006. 3,498,54315M30,00016-11/12510,000365,000.00Invention2000M12,00017204,000150,000.00Total212,0252,542,5051,833,392.538. There is no evidence refining or explaining what is included in the vague notion of Gilmour Co.'s "sales history." It appears that records of actual total sales of all products manufactured by Gilmour Co. for at least a 5-year period were avail1ble and may have been used by Smith. It is not clear whether complete production and sales records for each product manufactured under patent were available but it is clear that no such records were used by Smith in making his valuation.↩9. Smith used a 17-year useful life as the factor in computing the value for the card-packaging invention. This figure was presumably used because at the time of the stock purchase Smith contemplated patenting this invention; in fact a patent was obtained in 1972.↩10. The records of Gilmour Co.'s sales used by Johnston were those of total sales of all products, both patented and nonpatented; he used no records which identified sales of individual products manufactured, see fn.8, p.18, supra↩. None of the records of Gilmour Co. were offered in evidence. 11. Hoskhold's formula is a sinking fund method of valuation by which the taxpayer receives an assumed specified rate of interest on his capital (the present worth of estimated future earnings), and the capital is returned to the taxpayer by annual payments to a sinking fund accumulated at 4 percent interest, compounded annually. Hoskhold, Engineer's Valuing Assistant, 2d Ed. London, 1905.↩12. A patent was issued on the package in 1972.↩13. This includes $392.53 for the value of Design Patent 189,411↩ - Spray Nozzle, about which we have no evidence and neither Johnston nor Burns appeaised.14. Since respondent appears to have conceded all issues which were dependent upon whether the transaction between Smith and Gilmour was effective as of January 31, 1970, or March 31, 1970, we find no need for us to determine the effective date.↩15. SEC. 167. DEPRECIATION. (a) General Rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in the trade or business, or (2) of property held for the production of income.↩16. SEC. 334. * * * (b) Liquidation of Subsidiary.-- * * *(2) Exception.--If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if-- (A) the distribution is pursuant to a plan of liquidation adopted-- (i) on or after June 22, 1954, and (ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and (B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3) during a 12-month period beginning with the earlier of, (i) the date of the first acquisition by purchase of such stock, or (ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items. ↩17. Sec. 1.334-1(c)(4)(v), Income Tax Regs.↩, specifies the adjustments which are to be made to the petitioner's adjusted basis of the subsidiary's stock which include, in addition to those for cash and liabilities indicated in the text above, certain adjustments on account of the earnings and profits, or deficit thereof, realized by Gilmour during the period beginning February 1, 1970 through March 31, 1970. We received no evidence in this respect but any necessary adjustment can be made by the parties in the Rule 155 computation.18. Although Burns did not actually use the same figures as Johnston in making his determinations, the figures that he did use were not the result of independent research. The sales figures used by Burns in his calculations were the result of his rejection of the figures used by Johnston as unrealistic, followed by Burns' rather arbitrary selection of other amounts. ↩19. Although respondent, on brief, challenges the credibility of Johnston's evaluation on this basis, he cannot escape some responsibility for the lack of reliable data when, as it appears herein, he made no effort through means of discovery, to acquire Gilmour's production records. This is not a situation where respondent can rely upon the burden which falls on petitioner because respondent's determinations are presumptively correct.↩20. As indicated in our findings, see p. 15, supra.↩Smith used a different method to evaluate two of the patents. However, it is quite obvious that such method was no better than that rejected in the text above.21. We note that in Sec. 9 of the consulting agreement between petitioner and Gilmour it was provided that if Gilmour developed any product which may be patented, "he shall offer the same to the Company for a royalty equal to one and one-half per cent of the net sales by the Company of such patentable products over the life of the patent."↩22. Burns did indicate in his valuation report that reduced to terms of current cash value as of March 31, 1970, his aggregate determined fair market value of the patents and invention would be approximately $350,000.↩23. See also Moss American, Inc.,T.C. Memo. 1974-252↩. 24. Moss American, Inc.,supra.↩25. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B e8relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩26. See also James J. Arditto,T.C. Memo. 1971-210↩.